## TURNER *v.* DUNCAN *et al.*

ATKINSON, J. 1. A ground of a motion for new trial is incomplete which complains of a refusal to sustain an objection to a stated question propounded to a witness, but does not disclose the substance of the answer made by the witness.

2. A ground of a motion for new trial complaining of the overruling of a motion to rule out certain testimony delivered by a witness, which fails to state the ground of the objection that was urged before the judge for excluding the evidence, is too indefinite to present any question for decision.

3. On the trial of a case based on a statutory·claim interposed to a levy on land by a constable under a fi. fa. issued by a justice of the peace, the plaintiff offered in evidence the fi. fa., which contained a caption in which was stated the names of the plaintiff and of the defendant, following which was the direction: "To any lawful constable of said county, greeting." Then followed the command to levy on a sufficiency of the property of "the defendant above named," etc. *Held,* that it was not error to admit the fi. fa. in evidence over the objection that while the name of the defendant was stated in the caption, it was not again stated in the body of the fi. fa.

4. In the Civil Code, § 4767, it is declared: "No constable shall levy on any land unless there is no personal property to be found sufficient to satisfy the debt, which fact must appear by an entry on the execution to be levied by a constable of the county where such execution was issued, or where the property to be levied upon may be found: Provided, that the defendant shall have the right in all cases to point out any portion of his property in his possession he may think proper; and should he point out land to be levied upon, the above entry of 'no personal property' may be omitted." See also Civil Code, § 6034. The provisions of the Civil Code, § 3321, require the clerk of the superior court of each county to keep a general execution docket on which executions issuing from the several courts of this State and of the United States are required to be entered in order that they may be binding as against third persons. By subdivision 4, of paragraph 6, of § 4891 it is made the duty of the clerk of the superior court to keep an execution docket which shall show "the names of the parties and their attorneys, date, the time returnable, to whom and when delivered, when returned, and memoranda of all entries on the original." *Held,* construing together the several provisions above mentioned, the requirement in § 4891, that the clerk shall enter upon the execution docket all entries on the fi. fa., did not render inadmissible in evidence, on the trial of a claim case as described in the first note, a fi. fa. issued from a justice's court, which was levied by a constable upon land pointed out to him for the purpose of levy by the defendant in fi. fa., who was found in possession of the land, although the constable, prior to levying on the land, made an entry on the fi. fa. to the effect that he had made diligent search for personal property of the defendant and could find no such property

upon which to levy the fi. fa., and such entry was not entered by the clerk of the superior court upon the execution docket.

5. In a claim case the declarations of the defendant in fi. fa. tending to show the character of his possession are not inadmissible upon the ground that the declarant is not a party to the case.

(a) Testimony to the effect that the defendant in fi. fa., while residing on the land with his wife and family, declared, at a trial of his son under charge of a crime, that he was worth $2000, was of doubtful admissibility, but of such slight materiality that its admission would not require the grant of a new trial.

6. The evidence was sufficient to show title of the land in defendant in fi. fa.; and there was no error in overruling the motion to dismiss the levy, on the ground that the plaintiff failed to make out a prima facie case.

7. A ground of the motion for new trial (in so far as it presents any question for consideration) is without merit which alleges that the court erred in rejecting a copy of the original summons from the justice's court on which one of the fi. fas. was based, such copy being offered in evidence by the claimant for the purpose of showing that the amount of the plaintiff's demand was not specified in the original summons by any express allegation or by attaching a copy of the note sued upon, it being contended that because of such failure to specify the amount of the debt the judgment and fi. fa. based thereon were void. Even if the copy was admissible, it would not have been sufficient to show that the judgment was void. The defect in the summons complained of was an amendable defect and was cured by the judgment.

8. The judge charged the jury: "that a husband would have the right to make his wife a deed to any part of his property, . . provided he does not thereby defraud his creditors, . . provided he is not indebted, don't owe any debts at the time, no judgments or liens against him; . . can't do it when he is in debt." Error was assigned on this charge, because (a) "It is given without qualification." (b) The court should have charged that if defendant in fi. fa. "did not own the land and had not paid anything on it, and that his wife had paid all of the purchase money or he paid it. . . If she paid it, . . you would be authorized and the jury could not find a verdict against her. The charge was not strictly accurate, but the criticism that the charge was erroneous because "it was given without qualification" is not sufficiently definite to raise any question for decision. In a subsequent portion of the charge the judge instructed the jury substantially as it is insisted by the second criticism that he should have been charged.

9. In the 13th ground of the motion for new trial complaint is made of the charge: "He would have the right to make his wife the deed, if it was an honest transaction, . . even though she didn't pay any money, if by doing so he didn't deprive himself of the ability to pay his debts; . . and although he may become indebted afterwards, that wouldn't be a transaction as would defeat the deed. . . The honesty of this transaction you are to look to. . . See whether she paid the money on the land," the equitable title would have been in claimant

to find the property not subject. If you believe from the evidence that he  .  .  paid for this land, and that this transaction was fraudulent to defraud the plaintiff,  .  .  you should find the property subject." This charge was applicable to the issues involved in the case, and was authorized by the evidence. There was no contention that it did not state correct principles of law.

10. Other grounds of the motion for new trial complained that the verdict was contrary to certain portions of the charge delivered by the court. Such grounds are merely elaborative of the general grounds that the verdict was contrary to law, etc., and do not require separate consideration. The evidence was sufficient to support the verdict finding the property subject, and there was no error in refusing a new trial on any of the grounds taken.

*Judgment affirmed. All the Justices concur.*

No. 2158. SEPTEMBER 14, 1921.

Claim. Before Judge Irwin. Douglas superior court. June 28, 1920.

On November 6, 1914, a judgment was rendered in a justice's court, for $64.46 principal, with interest, attorney's fees, and costs of court, in favor of N. B. and J. T. Duncan against C. W. Turner, in a suit upon a promissory note. On December 4, 1914, another judgment in favor of the same plaintiffs in a similar suit against the same defendant was rendered in the same court for $90 principal, with interest, attorney's fees, and costs of court. Executions were duly issued and entered on the general execution docket on November 19, and December 17, 1914, respectively. The constable of the district in which the judgments were rendered made entry on each execution, to the effect that upon diligent search no personal property of the defendant could be found on which to levy. Subsequently the constable levied both executions on the same tract of land. When the sheriff of the county was about to expose the land to sale, Sarah Ann Turner, the wife of defendant in execution, interposed a statutory claim. The claim was returned by the sheriff to the superior court, where an issue was made, and the trial resulted in a verdict finding the property subject. The claimant made a motion for new trial, which was overruled, and she excepted. On the trial the plaintiffs introduced both executions with entries thereon, as above indicated; and tax digests of the county for the years 1910 to 1917, inclusive, showing returns of the property in the name of defendant Charles W. Turner; and also certain parol evidence. One of plaintiffs' attorneys testified to the following effect: At

the time of the levy the defendant was in possession of the land, residing thereon with his family. He purchased the land in 1905 or 1906, and had been in continuous actual possession, by residing thereon and cultivating the land for agricultural purposes, from 1908 until the time of the trial. During that period and both before and after "this litigation" commenced, he offered to sell the property for $1200. At the time of offering to sell, he did not make any statement as to who owned the property, though in one instance he said "he would settle this matter if Mr. Duncan would buy the land. [I] told him he might work up a trade with my son. [He] said if Mr. Duncan would buy the land he would pay it all. But he wanted to sell it all . . and get away from here." He told witness he gave $700 for the land. Witness could not identify a note dated March 10, 1912, exhibited to him while on cross-examination by claimant's attorney, as a note on which one of the judgments was based; witness explaining that he was not employed before the judgments were rendered and had never seen the notes. Another witness for the plaintiffs was the constable, who gave testimony to the following effect: Defendant was in possession of the land, residing on it with his family at the time of the levy, and pointed it out to witness as his property for the purpose of levy, and went with him to the attorney for the plaintiffs to make his return. Defendant had been in possession of the land for several years prior to the levy, during which time he and the several members of his family, including the claimant, engaged in the usual agricultural work on the land. Witness did not know, when he levied on the land, that claimant held any deed to it or claimed title or possession thereof. The justice of the peace testified for the plaintiffs that at the time the judgments were rendered both the claimant and defendant were present. Witness has been acquainted with C. W. Turner since 1904 or 1905, during which time he has lived about a mile away, and defendant has lived on the land with his family; and witness does not know of defendant's claiming any other land. Witness has seen both Mr. and Mrs. Turner working in the field on the land. O. C. Tyson, who was the former owner of the land, testified: Sometime about 1905, witness sold the land to defendant for $700, receiving seven promissory notes for $100 each, payable successively one

each year after the date of sale, and giving bond for title to the purchaser. The defendant went into possession at the time of the sale, and has been living there ever since. Witness sold the notes to S. O. Fielder.

The claimant introduced evidence as follows: (*a*) A copy of the summons on which the judgment was predicated. (*b*) A deed from O. C. Tyson to S. O. Fielder, dated October 14, 1905, on consideration of $425. (*c*) A deed from S. O. Fielder to C. W. Turner, dated October 19, 1912. (*d*) A warranty deed from C. W. Turner to claimant, dated October 19, 1912, recorded October 9, 1916, and expressing a consideration of $500. Claimant as a witness in her own behalf testified: Defendant bargained for the land, and witness furnished $700 to pay for it, giving the money to her husband to pay the notes as they would fall due each year: "I sent cotton by him to sell, except what I borrowed from my sister [Mrs. Mary O'Connell]. Cotton that me and the children made. There was paid from the cotton that was turned over to him $350; that was paid out of the cotton. The cotton was mine and the children's. . . My husband just said he would not pay for it; and me and him had a right smart little row, and he said he was going to leave me. I said, 'Go, if you go for that. I have moved around with you as much as I am going to on rented land.' He says, 'If you do you will pay for it yourself.' I told him we could, we done most of the work anyhow. He got his hat and started, I followed him a piece, and I says, 'If you go you can just go; don't come back any more; can stay with me or go if you please.' He set down awhile and studied about it, and come on back to the house. I paid $350 out of the cotton for the land. That was not all paid at one time. We took up the notes as they come due, a hundred dollars a year. I got money from no one else but my sister. I got from her $350. I paid it on the land. That paid the $700 that I am speaking of." To the question, "What did your husband tell you about you and the children paying for the land?" the witness answered: "He said we could do as we pleased after he come back, pay for it or let it alone; he wouldn't pay any out on it; he hadn't paid none and wouldn't have anything to do with it. I told him if he would stay there and help me we would swap work, what time he worked there. He worked for Banks & Co. a right smart;

did some work. Me and the children worked the crop — did not work any in the cotton-patch, only what he swapped in there. We hoed for him in the corn to get him to plow for us. He cultivated a corn-patch on the place. He made a little corn crop every year. I swapped with him — the corn crop belonged to him — he claimed it. I had nothing to do with the corn matter — only swapped work. We hoed for him, and he would plow some in the cotton — one of the boys plowed; he would plow some; when he got through, wouldn't have anything to do with it; just like a stranger, just like anybody else. He said he didn't care, just wanted to plow some. . . The deed was made to me because I paid for it, or furnished the money that paid for it. He says, 'If you will go on and pay for it, I will make the deed to it to you, and it will be yours.' Wanted him to do that so he couldn't never trade it. He was sorter bad about trading, making sorter bad trades. Told him wanted the deed made to me so he couldn't trade it. He agreed for me and the children to make the cotton on it and have the property myself." On cross-examination witness testified: "I saw deed from Fielder to Turner. Mr. Turner [never] turned me over any deed besides this one. I never had any other. The name of this lady, my sister, is Mrs. O'Connell. She furnished me this money . . along at different times when I needed it. I don't know that I can tell you about the times. I don't remember. When cotton was cheap and I failed a payment she furnished the money. I don't know what year it was. Before the deed was made of course. . . I would get about fifty dollars a year. . . I think I got forty one time. I remember I got money several times. I got some every year, because cotton was cheap then." Mrs. Mary O'Connell testified: " I let her have, before this place in question was finally paid for, $350; let her have it at one time. I think I let her have $40 at one time, but I would have to look over the memorandum to tell how much. When she needed money, if she was short in her payments, I let her have money, helped her out whatever it took to take up a note each year. I helped her take up a note each year. I know I let her have $350 to pay on the farm. That is the land in dispute." C. W. Turner, for the claimant, testified: " I am the defendant in this execution here. My wife furnished the money to pay for the land. A portion of it was made on the

place; her and her children made it; of course I plowed through it. My crop was the corn. . . I paid no money down on the land at first. I was to pay for it $700. I executed notes to Tyson. I give my notes — these notes to become due each year; they were paid. I paid the money over to him and taken up the notes. My wife delivered me the money. . . When a note would come due she would give me the money, and went and paid it to Tyson or Mr. Fielder; paid it all to Fielder." Q. "Here is a deed to the land that Fielder made you October 19, 1912; did he ever deliver you this deed?" A. "Yes, sir. The deed that I made to my wife, dated 19th day of October, 1912, the same day. Mr. Hall, J. P., witnessed both of these deeds." Q. "State who wrote the deed from Fielder to you. Do you remember who wrote it?' A. 'Mr. Hall witnessed the deed. He fixed up both these deeds the same day at Villa Rica. As soon as he turned me over the deed I told him then it wasn't made as I intended for it to be; told him I wanted it to my wife. Then he wrote this deed. I told him to make another one, I just forgot it. That was from me to my wife. He signed the deed and delivered it to me. I taken it home and delivered it to her, my wife. I haven't had no interest in that land since then, not only just to live on it. I live there with my wife and children." On cross-examination the witness testified, among other things, that he took the cotton away and sold and looked after it generally; that sometimes his wife would go with him; and that he sold a part in his own name and a part in his wife's name. Testimony by the daughter of the claimant tended to corroborate her testimony and that of her husband and sister, already quoted. The claimant further testified that she had furnished the money to pay the taxes on the land ever since she commenced paying the purchase-money.

*James & Bedgood,* for plaintiff in error.

*D. S. Strickland, J. H. McLarty,* and *W. H. Swofford,* contra.